PHILIP A. LEWIS
Attorney at Law
Suite 500
210 SW Morrison Street
Portland, OR 97204
(503) 226-3498
E-mail: phil@phillewis.com

     Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. CR 09-170 MO |
| Plaintiff, | ) | |
| | ) | SENTENCING MEMORANDUM |
| v. | ) | |
| | ) | |
| JAMES ALBERT JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant is before the court for sentencing after pleading guilty to Count 1 of the indictment herein, sex trafficking, 18 USC § 1591(b)(1). The crime to which defendant pleaded guilty carries a maximum sentence of life imprisonment, with a minimum of 15 years, followed by supervised release of at least 5 years and up to life. 18 USC § 3553(k).[1]

---

[1]The provisions of 18 USC § 3553(k) had been overlooked by everyone at the time of defendant's guilty plea. In his plea petition he had been advised that supervised release could be for up to 5 years. Codefendant Donnico Johnson had been similarly advised. This was only discovered recently, but counsel has had an opportunity to discuss this with defendant, and he is agreeable to waiving any error arising from this oversight, and proceeding with sentencing as scheduled.

1 - DEFENDANT'S SENTENCING MEMORANDUM

Defendant pleaded guilty with no plea agreement, and without any promise of sentencing concessions from the government, though the government has agreed that it will ask for the dismissal of the remaining counts following imposition of sentence.

For the reasons set out below defendant respectfully asks that the court impose a sentence no greater than the mandatory minimum required by law.

## I.  PROCEDURAL HISTORY

On June 24, 2009, defendant was charged in a superseding indictment with sex trafficking, 18 USC §§ 1591(b)(1) and 1591(bb)(2); transportation of minors, 18 USC § 2423; coercion and enticement, 18 USC § 2422; violation of the Mann Act, 18 USC § 2421; and forced labor, 18 USC § 1589. Charged with him as codefendants were Donnico Johnson and Lisa Miles.  The crimes were all alleged to have occurred between May, 2008 and October, 2008, and each of the counts named "A.K." as the victim.

On March 1, 2010, the court found defendant incompetent to proceed.  On December 14, 2010, after defendant had returned from the Federal Medical Center at Springfield, Missouri, the court found that defendant's competency had been restored.

In the meantime, on March 11, 2010, codefendant

2 - DEFENDANT'S SENTENCING MEMORANDUM

Donnico Johnson, pursuant to a plea agreement, pleaded guilty to Count 2, sex trafficking, 18 USC § 1591(b)(2), which carries a 10 year minimum and a maximum of life. Mr. Johnson has since been sentenced to 188 months, followed by 5 years of supervised release, the sentence sought by the government.

On April 6, 2010, codefendant Lisa Miles pleaded guilty to misprision of felony. She has since been sentenced to probation.

## II.    SENTENCING GUIDELINE CALCULATIONS

Sentencing guidelines are, of course, now merely advisory in nature. *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed.2d 621 (2005), and the sentencing range called for by the guidelines is now just one of the factors the sentencing court must consider when imposing a sentence. 18 USC § 3553(a)(4).

The guidelines serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 39, 128 S. Ct. 586, 169 L. Ed.2d 445 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 350, 127 S. Ct. 2456, 168 L. Ed.2d 203 (2007). Nevertheless, it is also important to note that the court in *Rita* declined to hold that the applicable sentencing guideline range be treated by the sentencing court as presumptively

reasonable, and held only that should a sentence fall within the applicable guideline range a reviewing court should view it as reasonable absent good reason to do otherwise.

With few exceptions, as noted below, defendant agrees with the sentencing guideline calculations set out in the Presentence Report (PSR).

A.   Influencing a minor to engage in prostitution

Paragraph 29 of the PSR calls for a 2 level enhancement pursuant to USSG § 2G1.3(b)(2)(B) for having unduly influenced a minor to engage in prohibited sexual conduct. USSG § 2G1.3(b)(2)(B) provides in relevant part,

> "If (B) a participant otherwise unduly
> influenced a minor to engage in prohibited
> sexual conduct, increase by 2 levels."

USSG § 2G1.3(b)(2)(B) does not apply to this case for two reasons. First, while defendant recognizes that his conduct was reprehensible, it would be incorrect to say that he compelled AK to become a prostitute in the first instance. It is undisputed that AK started engaging in prostitution well before encountering defendant.[2] Accordingly, neither defendant, his codefendants, nor anyone else who could be considered part

---

[2]In its sentencing memorandum relative to codefendant Johnson, the government noted that before AK met defendant she had been forced by her foster mother to work as a prostitute and to sell drugs. Government sentencing memorandum, page 5. And, in her statements to police, set out in discovery provided by the government, AK said that she had "turned herself out" at the age of 13. Discovery, at page 1078.

of the criminal conduct addressed by the indictment, played a role in AK entering the world of prostitution.    USSG § 2G1.3(b)(2)(B) would therefore not apply to the facts of this case.    *United States v. Brooks*, 610 F.3d 1189 (9th Cir. 2010).

*Brooks*, a sex trafficking case, is particularly instructive.    In *Brooks*, the court rejected the defendant's argument that the undue influence enhancement, USSG § 2G1.3(b)(2)(B), should apply.    The defendant in *Brooks* had argued that the enhancement was inapplicable because the girls in question had a history of having sex with other adults prior to meeting the defendant.    In rejecting the defendant's argument, the court noted that there was no evidence that the girls had a history of engaging in *commercial sex acts* prior to their having met the defendant.    *See also, United States v. Patterson*, 576 F.3d 431 (7th Cir. 2009)(undue influence found to apply where victim was induced by the defendant to work as a prostitute when she had no history of such behavior).

Second, the application of apply USSG § 2G1.3(b)(2)(B) to this case would amount to double counting.    The crime to which defendant pleaded guilty involves the use of force, fraud, or coercion, and it was those factors that caused the increase in defendant's base offense level from 30 to 34.    Accordingly, if the argument for the application of USSG § 2G1.3(b)(2)(B) is that defendant used undue influence to cause AK to work for him

5 - DEFENDANT'S SENTENCING MEMORANDUM

as a prostitute, it would amount to improper double counting as it was already taken into account when setting the base offense level. *Cf., United States v. Reese*, 2 F.3d 870, 894 (9th Cir. 1993)(not impermissible double counting where the guidelines clearly intended the enhancement).

It also bears noting that this enhancement was not applied to codefendant Johnson, who pleaded guilty to recruiting and enticing AK to work as a prostitute. Indeed, the government did not even advocate that it applied. *United States v. Brooks, supra.*

Finally, as a procedural matter, defendant submits that because the issue of whether defendant exerted undue influence over AK to work as a prostitute might be contested, and the court's finding would affect the guidelines calculations, any finding by the court must meet the beyond a reasonable doubt standard.[3] *In re Winship*, 397 U.S. 358, 363-368, 90 S. Ct. 1068, 25 L. Ed.2d 368 (1970); *United States v. Wilbur*, 421 U.S. 684, 697-99, 95 S. Ct. 1881 (1975)(reasonable doubt standard applies to facts which increase punishment).

While no longer binding on the court, sentencing guideline calculations nevertheless help to determine the

---

[3]It remains unclear whether the government will in fact contest this given its earlier statements to the court to the effect that AK had been working as a prostitute prior to her having met the defendants in this case, and defendant had not induced her to engage in such kinds of activity.

6 - DEFENDANT'S SENTENCING MEMORANDUM

court's sentencing decision, and are important to the point where an accurate guideline calculation is necessary and can be subject to appeal. Thus, given the heightened need for accuracy, Fifth Amendment due process requires the use of the reasonable doubt standard as to judicially made factual findings as they bear on contested sentencing guideline enhancements.

The Fifth Amendment due process clause also prohibits the application of a presumption of undue influence as advocated by Application Note 3 to USSG 3G1.3(b)(2)(B), and as advocated in the PSR. Such a shifting of the burden of proof is impermissible. *United States v. Wilbur, supra.* (It is a due process violation to shift a burden of proof to the defendant once the prosecution has established certain facts.) *See also, Gall v. United States*, 128 S. Ct. at 602-03(Scalia concurring, and suggesting that the right to a jury trial on sentencing facts might in some cases be required).

B. Use of a computer

Defendant concedes that the two level enhancement for use of a computer, USSG §2G1.3(b)(3)(B), might apply given the fact that people in this case, charged and uncharged, used a computer, i.e., posted AK on the Internet through Craig's List. However, its application to defendant would overstate his conduct.

Defendant's involvement with the use of a computer was

incidental and vicarious in nature.    It was the result of actions undertaken by codefendant Miles, who in turn acted under the direction of codefendant Johnson.    Johnson and Miles used defendant's telephone number initially for opening the account before changing it over to AK's.    Defendant did not open an account with Craig's List or even know how to do so.    And, as noted by AK, she got her customers not from the Internet but by being on the street.    Again, this is not to minimize in any way defendant's behavior or the impact it had on AK, but rather to point out that it would be an overstatement to say that defendant played any meaningful role relative to the use of a computer.

C.    Acceptance of responsibility

Defendant concedes that USSG § 3E1.1 provides for only a 2 level downward adjustment for acceptance of responsibility unless the government agrees to an extra level.    Thus, with no plea agreement, and with the government not recommending a 3 level adjustment, a strict reading of the guidelines would allow for only a 2 level adjustment.    However, for reasons set out below relative to 18 USC § 3553(a) factors, this results in an unnecessary and unjust inflation of the net offense level.

III.    18 USC § 3553(a) FACTORS

18 USC § 3553(a) provides that the court "shall impose a sentence sufficient, but not greater than necessary, to comply

with the purposes" set out further in the statute, taking into account the nature of the offense. Among the specified purposes are (a) to provide a general deterrence by reflecting the seriousness of the offense and promoting respect for the law; (b) to afford adequate specific deterrence to the defendant himself; (c) to protect the public; and (d) to provide the defendant with needed training, medical care or other correctional treatment "in the most effective manner," all of course within the context of the sentencing guidelines. 18 USC § 3553(a)(2). And, of course, the court is to fashion a sentence that avoids unwarranted disparities among the sentences imposed on codefendants. 18 USC § 3553(a)(b).

In other words, as stated in 18 USC § 3553(a)(1), the sentencing court "shall" consider "the nature and circumstances of the offense and the history and characteristics of the offender." As noted throughout this memorandum, defendant does not dispute that his conduct both historically and relative to AK in particular was nothing short of shameful and abhorrent. However, defendant's own unusual and tragic personal history, while not offered at all as an excuse, helps explain his behavior, and provides some degree of mitigation.

A. Defendant's personal circumstances

1. Defendant's childhood

The PSR, both in its body and in its attachments,

describes in some detail the various problems defendant encountered from his very start in life. These include a history of mental illness in both of his parents, a drug addicted mother, a violent father, a painful birth defect which has required periodic surgery and prosthetic implants, and other health problems.

The PSR also describes defendant's childhood as involving abandonment, first by his mother and then by his father, followed by placement with a foster home far from his home and real family in Texas. And, the foster home, while disguised as a church, was actually a hotbed of criminal activity and a source of abuse.

In addition, there was what amounted to a form of sexual abuse of defendant and his brother by their step-mother, as described by defendant's brother, Robin. *See*, investigation report of interview with Robin, attached to PSR.

2.  Mental health problems

As also described in more detail in the PSR and its attachments, there is the matter of defendant's poor mental health. Over the objection of the government, the court found defendant incompetent to stand trial, and that was after defendant had been in a controlled and structured environment for over a year, where he had been receiving medical care, psychotropic medication, and adequate nutrition, all the while

being away from substance abuse and the stress and chaos of life on the streets.

Although it has been argued that defendant was faking his mental health problems, there remains the fact that, shortly before his arrest, defendant's father was so concerned for his son's mental health that he got him to go to the local social security office. That resulted in defendant being declared mentally disabled, and his father being assigned the job of acting as his conservator. Similarly, other members of defendant's family in Texas had observed various symptoms in defendant. Problems observed included paranoia, obsessiveness, and troubling memory problems, all when there was no reason for defendant to manufacture or exaggerate such problems.

3.   Intellectual deficits

As noted in detail in the psychological evaluations attached to the PSR, defendant also suffers from serious intellectual deficits. When first tested by Dr. Grounds, there were indications that defendant was not putting forth his best efforts in some of the testing, leading to concerns of malingering. That was a concern too of staff at FMC Springfield. However, subsequent testing with validity scales showing an absence of malingering reveal that, at his best, defendant truly does suffer from significant intellectual deficits. Specifically, subsequent testing found him to have a

full scale IQ of 73, a 4th percentile score, placing him in the extremely low to borderline range of intellectual functioning.

Whether defendant's intellectual deficits are the result of congenital factors or head injuries as child, his poor functioning was noted early in his life.  As recalled by his younger brother, Robin, defendant was twice held back a grade, allowing Robin to catch up with him.  *See,* investigation report of interview with Robin, attached to PSR.   This is further evidence that defendant's intellectual deficits and/or learning disabilities are both real and longstanding.

Defendant's terrible childhood, physical health problems, mental health issues, and intellectual deficits are not excuses for his behavior towards AK and towards others over the years.  But, they certainly help to explain his history of violent behavior, particularly towards women.  His low level of intellectual functioning also negates the suggestion that defendant was acting in any kind of crafty or well planned manner relative to his victimization of AK.  It also highlights the degree of his dependance on codefendant Johnson, a topic discussed in more detail below.

Finally, and perhaps most important, defendant's background, especially coupled with his mental health and intellectual shortcomings, made it more difficult for him to empathize with his victims and to admit to himself how terrible

he had been to them.  Now, with defendant finally on the right medications and at the right doses, thanks to the staff at FMC Springfield, defendant is beginning to see what he has done over the years, and he is beginning to understand the need for him to confront his history of victimizing others in order to begin addressing the problems that got him to this point in his life.

That defendant is actually starting to go down what for him will be long and difficult path towards rehabilitation is illustrated by several things.  First, when defendant pleaded guilty he told the court that he was doing so because he had come to see it as the right thing to do, not for himself as much as to spare AK further trauma.  Second, defendant has begun to express real feelings of remorse, as observed by Dr. Grounds when she saw him following his return from FMC Springfield.  And third, there is the fact that since his return from Springfield defendant has begun to take classes at FDC Sheridan.  *See,* PSR, paragraph 93.  While these classes might be simple and short, lasting one day or less, they show his desire to engage in efforts towards self-improvement.

B.  Acceptance of responsibility

Within hours of defendant indicating that he wanted to do the right thing and accept responsibility for his actions, defense counsel was sitting down with counsel for the government to advise him of that.  This occurred shortly after defendant

13 - DEFENDANT'S SENTENCING MEMORANDUM

had returned from FMC Springfield with his competency restored. Further, this was prior to the government advising counsel that Johnson had given a proffer a year earlier. The government was advised several times that there was no need to continue to prepare for trial and to arrange for the transportation of witnesses to Oregon, an interest USSG § 3E1.1(b) is designed to promote. That the case was not set immediately for a plea was largely a function of the complexities, logistical and otherwise, in communicating with defendant. Had defendant been competent from the start, he likely would have been the first to plead guilty.

Further, as discussed in more detail below, in contrast to codefendant Johnson, defendant is truly accepting responsibility. His guilty plea was not entered begrudgingly or out of a feeling of resignation, but was entered sincerely, without reservation or in exchange for any benefit from the government. Rather, it was entered as one of the first steps he must take to atone for his actions.

Accordingly, that defendant can only receive a 2 level downward adjustment pursuant to USSG § 3E1.1 results in an inaccurate reflection of the level of defendant's acceptance and remorse. This is something the court can and should take into account when applying 18 USC § 3553(a).

C.   Need to avoid unwarranted disparities

Defendant concedes that in some ways his behavior relative to AK was qualitatively different from that of codefendant Johnson. After all, it was defendant, not Johnson, who had acted as AK's pimp. But, Johnson's significant role in the victimization of AK, his own legal history, and his attitude towards his behavior, are such as to render it appropriate for defendant to receive a similar sentence.

At Johnson's sentencing hearing, the government argued that without Johnson's assistance AK would not have been transported to Oregon. As noted by the government, defendant had no money, no car, and no computer, and he relied heavily on Johnson in many ways. Defendant needed Johnson to get him around, to help him buy things for AK, to show him where to have AK work on the street, and generally how to be a pimp. The government pointed out that Johnson was needed to help defendant and AK have cell phones, and to drive AK to her customers or to places where she could find customers, and that it was Johnson who instructed Miles to take photographs of AK and to post her on the Internet. Transcript, June 21, 2010, pages 13-15. And, it was out of fear of Johnson that Miles complied.

Also as noted by the government, and also noted by AK's attorney, Dan Lorenz, it was Johnson who was the "bigger pimp," and who acted as defendant's mentor. Johnson instructed defendant on how to control AK and how to beat her. Johnson

profited from AK's work, directly and indirectly. As argued by both the government and by AK's attorney, Johnson was not a minor participant; rather, he was a crucial catalyst for this criminal enterprise to occur at all. *Id.*, at pages 14-17.

In hindsight, thanks to a thorough exploration of defendant's personal history and his level of intellectual functioning, it makes sense that defendant would be so dependent on Johnson for so many things.

Johnson's history of victimizing others is also similar to that of defendant's, though Johnson also has his extensive history of pimping women. And, as noted in the PSR, paragraph 16, Johnson carried a gun with him at all times.

It is also significant that at no time does it appear in the record that Johnson has accepted responsibility for his criminal conduct in this case, other than by reluctantly pleading guilty to Count 2. Nor does it appear that Johnson has accepted his history of abusing others, including Miles, whom he considered his girlfriend but whom he had also viciously abused and pimped for years. At both his plea and sentencing hearings, the most he could say was that he felt bad for having given defendant and AK a ride to Portland. He remains as self-centered and as oblivious to how he has harmed others as before he was arrested. And, unlike defendant, Johnson has no apparent interest in identifying and addressing the problems that have

led to him likely dying in prison and away from his family.

By contrast, defendant is starting to come to grips with his history of violence, especially towards women, as well as his other anti-social activities. It has not been easy for him; it has been hard for him to admit these things to himself, and it has begun to cause him to feel ashamed of himself, a painful but necessary step in the process of rehabilitation. Defendant understands that he must admit his past in order to address and improve his future, and to atone for his transgressions. He also wants to someday have his father be proud of him, and to do that he knows he must do what is right. Defendant is beginning to understand that he cannot change the past, and that there is very little he can to do to help make AK whole. He has limited abilities, and no resources. What he can do, however inadequate as it might be towards helping AK, is to accept responsibility for his actions and to apologize to AK.

Johnson's and defendant's relative culpability in this case, while not identical, are nevertheless similar. Their legal and behavioral histories are also similar. On that basis alone, defendant's sentence should be on a par with that of what Johnson received. The fact that defendant, with all of his limitations, is taking responsibility and trying to atone, further militates in favor of a sentence no greater than that given to Johnson.

17 - DEFENDANT'S SENTENCING MEMORANDUM

The government sought and received for Johnson a sentence of 188 months. This was based on such factors as AK's vulnerability, defendant's violent conduct towards her, Johnson's criminal history which included significant violence towards women, and his essential role in this case. There is little to support a sentence for defendant significantly different from that handed down to codefendant Johnson.

## IV.  SUPERVISED RELEASE

The PSR is recommending supervised release for life. Such a lengthy term of supervised release does not appear warranted. Codefendant Johnson, whose culpability and history of violence is at least as bad as defendant's, received only 5 years of supervised release.

Defendant also objects to the condition recommended in the PSR relative to contact with minors. There does not appear to be anything in his history indicating that he has a sexual preference for minors, or a history of abusing minors other than the victim in this case. Further, the fact that AK was a minor was more a matter of happenstance than anything.

## V.  USE OF COMPUTER WHILE INCARCERATED

Defendant acknowledges that in the context of this proceeding the court cannot order the Bureau of Prisons to allow an inmate access to computers for e-mailing friends and family. However, defendant would ask the court to do what it can to

influence the BOP to lift its prohibition on him from being able to use e-mail. This would include issuing a finding that the use of a computer in this case was by other participants, and that defendant's involvement with a computer was tangential. Defendant would also ask that the court include in its sentencing order a recommendation that defendant be considered for approval for using e-mail as it will assist in his establishing and maintaining contact with his family. Neither defendant nor his family can easily afford the high cost of telephone calls from prison.

Access to e-mail is extremely important for defendant, who has long struggled with issues related to his separation from his family. He has been advised by staff at FDC Sheridan that he cannot have access to e-mail because of information provided by the government. However, this might change if the court were to make appropriate findings and/or recommendations.

VI.   DESIGNATION AND RDAP

Defendant respectfully asks that the court recommend that he be allowed to serve his time at FCI Sheridan. Defendant's father is not in a position financially to visit him regardless of where he is designated by the BOP. However, defendant's brother, Robin, lives in Seattle, and would be in a position to visit occasionally if defendant were serving his time at Sheridan. If the BOP cannot designate FCI Sheridan as

his place of confinement, defendant would ask that he be place somewhere within the Western Region.

Defendant further requests that the court recommend that defendant be allowed to participate in the BOP's residential drug and alcohol program (RDAP). Defendant recognizes that, due to the nature of his crime of conviction, as well as his legal history, it is highly unlikely that he will be able to receive any form of early release for having successfully completed RDAP. However, he feels he needs what it has to offer, and that it can help him identify and address his various problems, including substance abuse, and to help him to avoid recidivating upon release from prison.

## VII. DIFFERENT ATTORNEY TO PURSUE ANY APPEAL

Defendant has not waived his right to appeal. If defendant were to wish to appeal, which would likely be limited in scope to his sentence, it is requested that new counsel be appointed for that purpose. Current counsel prefers to avoid handling appeals as he cannot do them as efficiently as those who regularly do them. Both defendant and the CJA funds would thus be better served with other counsel handling any appeal.

DATED this 25th day of May, 2011.

Respectfully submitted,

PHILIP A. LEWIS, OSB #78284
Attorney for defendant

20 - DEFENDANT'S SENTENCING MEMORANDUM

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing defendant's sentencing memorandum on the attorneys listed below on May 25, 2011, by hand delivery to said attorney's office a true copy thereof, certified by me as such, contained in a sealed envelope, addressed to said attorney at said attorney's last known address, and by sending via email an electronic copy, to witt:

Kemp L. Strickland
Assistant United States Attorney
1000 SW Third Avenue
Suite 600
Portland, OR 97204
E-mail: kemp.strickland@usdoj.gov
  Attorney for Plaintiff


on said day.

DATED: May 25, 2011.


PHILIP A. LEWIS, OSB #78284
Attorney for Defendant


1 - CERTIFICATE OF SERVICE